# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **In re:** | |
| THOMAS C. HUGUES, JR. and JOANNA HUGUES, | **Bankruptcy Case No. 05-40214** |
| **Debtors.** | |
| R. SAM HOPKINS, Trustee, | **Adv. Proceeding Case No. 05-8133** |
| **Plaintiff,** | |
| vs. | |
| THOMAS C. HUGUES, JR. and JOANNA HUGUES, | |
| **Defendants.** | |

## MEMORANDUM OF DECISION

**Appearances:**

    Jim Spinner, SERVICE SPINNER & GRAY, Pocatello, Idaho, Attorney for Plaintiff.

    Brent Morgan, Pocatello, Idaho, Attorney for Defendants.

MEMORANDUM OF DECISION - 1

**Background**

Plaintiff, Chapter 7 Trustee R. Sam Hopkins ("Trustee"), commenced this adversary proceeding seeking an order revoking the discharge previously granted to the debtors in this bankruptcy case, Defendants Thomas and Joanna Hugues. Plaintiff contends that Defendants obtained the discharge by fraud. *See* 11 U.S.C. § 727(d)(1).[1] Trustee claims Defendants failed to adequately disclose in the bankruptcy case that they owned a fifth-wheel trailer capable of hauling eight horses, which Trustee later recovered and sold at auction for $12,000. Defendants acknowledge that their bankruptcy schedules contain no reference to this trailer, but they deny this omission was motivated by any intent to defraud Trustee or their creditors.

The Court conducted a trial in this action on July 28, 2006, at which the parties appeared and presented evidence and testimony. Having taken the issues under advisement, the Court has carefully reviewed the evidence, evaluated the witnesses' testimony, and considered the relevant legal authorities. Ultimately, the Court's disposition of the issues turns largely upon Defendants'

---

[1] References are made to the Bankruptcy Code, Title 11, U.S. Code, and to the Federal rules of Bankruptcy Procedure, Rules 1001–9036, as they existed prior to enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23 (Apr. 20, 2005). Debtors' petition preceded BAPCPA's effective dates of April 20, and October 17, 2005.

MEMORANDUM OF DECISION - 2

credibility. Because, in the end, the Court believes Defendants when they say they did not intend to conceal the trailer, the Court concludes that judgment should be entered in their favor and their discharge preserved.

### Facts[2]

Defendants filed a chapter 7 bankruptcy petition on February 14, 2005. A discharge was entered in their favor on May 25, 2005.

On December 7, 2005, Plaintiff filed a complaint to revoke Defendants' discharge under § 727(d)(1), alleging that Defendants had fraudulently misrepresented the type and value of a horse trailer in their schedules as a "utility trailer" worth $150. Schedule B, Ex. 1. Defendants contend that while they did indeed own a small utility trailer worth $150, that through innocent oversight, they failed to include a description of the horse trailer in their schedules.

Debtors' background, education, and experience bears on the outcome in this case. Mr. Hugues is disabled as a result of injuries he suffered in a serious accident involving a horse in 2003. He endured a broken neck, has nerve damage impairing the use of one arm, and does not remember the accident. Prior

---

[2] This Memorandum constitutes the Court's findings of fact and conclusion of law. Fed. R. Bankr. P. 7052. The Court's factual findings are, in large part, based upon its assessment of the credibility of the witnesses after having observed them testify. To the extent that the testimony of the witnesses was inconsistent with other evidence offered at trial, the Court's findings reflect its judgment concerning the relative weight assigned to that testimony.

MEMORANDUM OF DECISION - 3

to this unfortunate incident, Mr. Hugues raised cattle and assisted Mrs. Hugues with her horse-training business.  He completed the tenth grade and has been a rancher his entire life.  The Court observed during the course of his testimony that Mr. Hugues is a man of few words.  His speech was slow and his choice of words deliberate.  Importantly, at times, Mr. Hugues seemed confused in attempting to respond to questions by counsel.

As a result of her husband's accident, Mrs. Hugues assumed primary responsibility for the welfare of the family.  She continues to train horses for clients, as she has done for the thirty years since she graduated from high school.  Defendants have one daughter, age sixteen, who competes in rodeos using a horse that was a gift from her grandfather.

Defendants purchased the horse trailer in question in March 2004 after their previous one was wrecked and could no longer be used to transport clients' horses and cattle.  Their banker, Mr. Bodily, helped them locate a replacement trailer through a dealer.  Mr. Hugues received $2,000 credit for trading in the damaged trailer and paid an additional $3,850 in cash to buy the new one.  When he purchased it, Mr. Hugues was told that it was new, but that it had certain factory defects, and required a new floor, strut work, and axle work.  Mr. Hugues believed he could repair the problems.  Defendant testified that he never

MEMORANDUM OF DECISION - 4

had a chance to perform the repairs, though, and that the family had not used it before it was turned over to Trustee.

Mr. Bodily played a role in this transaction not only by assisting Defendants in finding a dealer who could help Mr. Hugues replace the wrecked trailer, but also because the old horse trailer was pledged as security for a loan Defendants had with his employer, Citizens Community Bank. Ex. D. Before Defendants purchased the new trailer, Mr. Bodily agreed to release the bank's lien noted on the certificate of title for the old trailer with the understanding that when Defendants obtained the certificate of title for the new trailer, the title would be given to the bank so a lien could be noted. Mrs. Hugues agreed to forward the new certificate of title to the bank once she received it, and at the time believed she had done so.

When Defendants filed for bankruptcy in February 2004, they were suffering the effects of a theft of their credit cards. Mr. Bodily confirmed that, throughout his business relationship with Defendants since 1998 or 1999 when he assumed management of their loans, they had always had a consistent amount of credit card debt hovering around $10,000. But, sometime in 2003, Defendants' unsecured debt ballooned to over $100,000. Trustee presented no evidence that Defendants made significant purchases during this time, and the Court presumes,

MEMORANDUM OF DECISION - 5

as Defendants explained, that the bulge in their debt was indeed the result of the unauthorized use of their cards.  Because Defendants were unable to resolve the problem with their creditors even after consulting an attorney, they filed for bankruptcy.  Meanwhile, they continued to pay the bank the amounts due on their loan in a timely manner.

Mrs. Hugues, along with Defendants' counsel, supervised preparation of the bankruptcy petition, schedules and statements.  She completed her attorney's questionnaire that provided the bulk of the information about Defendants' debts and assets for inclusion in their schedules.  During this time, Mr. Hugues was undergoing medication changes and was little help, although he did review the information his wife included in their draft bankruptcy schedules.  On their bankruptcy questionnaire, Mrs. Hugues listed Defendants' secured creditors, including the bank.  She listed the following items as security for the bank's loan: "Barn Panels Hay Trailer Utility trailer all accounts inventory & equipment & general intangibles."  Ex. A.  In the list of personal property in the questionnaire, she identified the vehicles and trailers Defendants owned as a "1992 Ford Flat Bed" worth $1,000 and a "Home made feed trailer" worth $500.  Ex. A.  She also disclosed they owned a 2004 Ford pickup securing an auto loan

with the bank.. Ex. A. In their schedules, Defendants expressed their intent to reaffirm the debts owed to the bank. Exs. B, D.

Defendants' schedule B filed with the Court contains all of the information Mrs. Hugues included in the informal questionnaire plus some additional data. The schedule identified the 2004 Ford truck worth $28,000 securing a debt of $35,000, and under the category "Farming equipment and implements" the schedule lists the following:

| | |
|---|---|
| Utility trailer | $150.00 |
| Barn panels | $200.00 |
| 1992 Ford flatbed pickup | $1,000.00 |
| Home-made hay trailer | $500.00 |

Ex. 1. In schedule D, Defendants listed the debt owed to the bank and described the following property as subject to its lien:

Secured by barn panels valued at $200.00
Hay Trailer valued at $500.00
Utilitay [sic] trailer valued at $750.00
All accounts, inventory and equipment valued at
$Unknown

Ex. 1.

Defendants both confirmed they did not disclose the horse trailer anywhere in their schedules. Mr. Hugues testified he was not aware the horse trailer was not listed. Mrs. Hugues testified she believed, obviously incorrectly,

MEMORANDUM OF DECISION - 7

that the bank owned the trailer because of its lien, and that it was sufficiently identified in the list of security for the bank's loan.

Two days after Defendants received their discharge on May 25, 2005, Trustee received an anonymous tip that Defendants owned a large fifth-wheel trailer.  He obtained a motor vehicle title search from the Idaho Department of Transportation, Ex. 2, which revealed Defendants owned a 2005 Featherlight horse trailer with no lien holder listed on the certificate of title.  On May 31, 2005, he withdrew the "no-asset" notice he had filed in the bankruptcy case, and sent a letter to Brent Morgan, Defendants' attorney, requesting clarification concerning several vehicles mentioned in the title report.  Mr. Morgan responded on June 6, 2005, listing the year, make, model, and description of the vehicles in question.  Ex. 4.  Item number three in his letter identified the horse trailer as a "2005 CECF TL," and mistakenly explained that it was listed in Defendants' schedules as the "utility trailer."  After checking the status of all seven vehicles listed, Trustee concluded that Defendants had misrepresented, or excluded, the horse trailer in their schedules.

Trustee insisted that Defendants submit to a Rule 2004 Examination scheduled for August 24, 2005.  Ex. 8.  Defendants both attended the examination, but only Mr. Hugues answered questions.  To the Court, the exchange that

MEMORANDUM OF DECISION - 8

occurred at the examination concerning the trailers is telling, because it evidences Mr. Hugues' surprise when confronted with his inaccurate bankruptcy schedules. Ex. 8 at 17–19.  When Trustee asked him about the trailers, and why the utility trailer (which Trustee understood was intended to refer to the fifth-wheel) was only worth $150, Mr. Hugues answered:

> A.  It's pretty much a homemade trailer.
> Q.  I mean the horse trailer.  You have the horse trailer being valued at $150 in your schedules.
> A.  I have got it valued at 150?
> * * *
> A.  That's not right, it's worth more than 150.  The utility trailer is a homemade trailer, you could probably look at it as 150 if you could find somebody to give it to - -
> Q.  You have the homemade hay trailer valued at $500 in your schedules.
> A.  Well, it would probabliably [sic] be worth 500, that's what I represented by making it.
> Q.  How about the horse trailer, do you know about what the value on the horse trailer, then?
> A.  The horse trailer is worth probably $2,000 more than what I gave for it, so it would be worth probably $5,800.  Did I answer them questions backwards there?
> Q.  No, I think you addressed the questions I had on that, and I think the questions that the trustee had on that.

Ex. 8 at 18–19.  As can be seen from this exchange, Mr. Hugues identifies he owns three trailers, not two, and that he is surprised he would list the horse trailer as only being worth $150.  Consistent with his testimony during trial, Mr. Hugues

MEMORANDUM OF DECISION - 9

does not attempt to be evasive, and testified that he believed he had cleared up the confusion. Besides the horse trailer, Trustee found no other misrepresentations in Defendants' schedules, and thereafter pursued turnover of the horse trailer. Ex. 5. He withdrew a second motion for turnover of a tractor, because after inspection he found that Defendants' representation concerning its value was correct.

Mrs. Hugues was confused as to why the bankruptcy trustee could recover the horse trailer because she believed the bank "owned" the trailer and possessed the certificate of title. When she learned of the Trustee's intent to take the fifth-wheel, she called Mr. Bodily requesting the title to the horse trailer. She recalls asking Mr. Bodily why Trustee could obtain the trailer when the bank owned it pursuant to the loan. When Mr. Bodily could not find the certificate of title to the fifth-wheel in his records, Mrs. Hugues searched her files and located it in an unopened envelope stuffed in a binder concerning the horse trailer. Defendants promptly turned it, along with the horse trailer, over to Trustee. When she was asked at trial why she did not identify the horse trailer in Defendants' schedules, she explained that she thought the bank owned the horse trailer and that therefore it did not need to be listed. It was clear to the Court that, at least in her mind, Mrs. Hugues believed there was a distinction between the ownership of an item of property pledged as security for an auto loan, which she did list as

MEMORANDUM OF DECISION - 10

something she owned, and the titled horse trailer, which she believed she did not own because she "didn't take a loan out specifically for it."

After the sale, Defendants promptly amended their schedule B to reflect their ownership of the horse trailer and its sale value of $12,000. Mr. Hugues, however, did not believe the horse trailer was worth $12,000 and testified, given the defects in the trailers' construction, that he would not have paid $12,000 for it.

## Disposition

### I.

A discharge granted under chapter 7 of the Bankruptcy Code may be revoked if "such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge . . . ." 11 U.S.C. § 727(d)(1). Section 727 should be construed liberally in favor of the debtor and strictly against those objecting to discharge. *First Beverly Bank v. Adeeb* (*In re Adeeb*), 787 F.2d 1339, 1342 (9th Cir. 1986); *Bowman v. Belt Valley Bank* (*In re Bowman*), 137 B.R. 922, 924 (9th Cir. BAP 1994); *Krommenhoek v. Covino* (*In re Covino*), 241 B.R. 673, 678 (Bankr. D. Idaho 1999). However, only honest debtors deserve a bankruptcy discharge and a fresh start. *Covino*, 241 B.R. at 678. Plaintiff bears the burden of proving

MEMORANDUM OF DECISION - 11

grounds exist to revoke a discharge by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 284 (1991); *Beauchamp v. Hoose* (*In re Beauchamp*), 236 B.R. 727, 730 (9th Cir. BAP 1999); Fed. R. Bankr. P. 4005.

To prevail under § 727(d)(1), the plaintiff must prove that the debtor committed "fraud in fact." That is, fraud must be shown to have occurred in the procurement of the discharge, and sufficient grounds must have existed which, had it been apparent, would have prevented the discharge. *Bowman*, 137 B.R. at 925. In other words, the plaintiff must prove that, "but for the fraud, the discharge would not have been granted." *White v. Nielsen* (*In re Nielsen*), 383 F.3d 922, 925 (9th Cir. 2004). The plaintiff must also persuade the Court that he or she was unaware of the fraud at the time the discharge was granted. *Bowman*, 137 B.R. at 925.

The grounds for denial of discharge are enumerated in § 727(a), to which § 727(d) refers. That section directs the court to deny a discharge if the debtor knowingly and fraudulently made a false oath in or in connection with the bankruptcy case. 11 U.S.C. § 727(a)(4)(A). Under this statute, the plaintiff must show "actual intent to hinder, delay or defraud . . . . Constructive fraudulent intent cannot be the basis for denial of discharge, but fraudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of

MEMORANDUM OF DECISION - 12

conduct." *Devers v. Bank of Sheridan, Montana* (*In re Devers*), 759 F.2d 751, 753–54 (9th Cir. 1985) (citations omitted). "Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of the case." *Devers*, 759 F.2d at 754.

## II.

Trustee contends that Defendants either fraudulently misrepresented the description of the fifth-wheel horse trailer in their schedules, or that they failed to disclose the trailer at all. He argues that Defendants took this approach because it was their most valuable asset and they wanted to avoid losing it to liquidation. He suggests Defendants further perpetrated their fraud when specifically asked about their vehicles by misleading him that the horse trailer was actually a "utility trailer" and that its value was only $150, not some significantly higher amount up to $12,000.

There are several reasons why the Court disagrees and instead concludes Defendants did not knowingly and fraudulently fail to disclose the fifth-wheel trailer in this case.

First, the record fails to support a finding that Defendants engaged in any pattern of conduct regarding their other assets in an attempt to hide information from Trustee. But for the erroneous or missing information about the

MEMORANDUM OF DECISION - 13

fifth-wheel, Defendants' schedules contain no significant misinformation. For example, Trustee discovered nothing untoward regarding a tractor he also believed was undervalued in the schedules, eventually concluding it was represented correctly. And despite the "run-up" of their unsecured credit card debt shortly before filing for bankruptcy, there is nothing to suggest that Defendants engaged in any binge in purchasing assets or services on credit.

While he reviewed them before he signed them, the Court is persuaded that Mr. Hugues, in his disabled state, did not appreciate that the trailer had not been adequately disclosed. And while Mrs. Hugues was obviously wrong in her understanding, the record supports a finding that Mrs. Hugues did not realize the trailer could be liquidated for the benefit of their creditors in the bankruptcy case. Mrs. Hugues did not include the fifth-wheel in Defendants' list of property because she erroneously concluded she did not need to do so. Consistent with this mistake, when faced with the Trustee's turnover motion, Mrs. Hugues called Mr. Bodily at the bank to ask him why the horse trailer could be sold when the bank owned it and it was subject to the bank's lien. The Court believes Mrs. Hugues that she initially thought the bank had the certificate of title until she found the unopened envelope containing the title certificate in a stack of paperwork. This testimony established that Mrs. Hugues believed the bank, not

MEMORANDUM OF DECISION - 14

her other unsecured creditors, was entitled to the horse trailer.  Given this evidence, the Court is not persuaded that Defendants' failure to disclose the horse trailer constituted a deliberate omission in an attempt to conceal assets capable of being liquidated for their unsecured creditors.

Defendants were not sophisticated borrowers, a fact apparent both to the Court and to Mr. Bodily, their banker for the past several years.  His familiarity with Defendants leads the Court to believe his characterization of Defendants as honest people, which in turn supports the notion that Mrs. Hugues thought the bank owned the trailer outright, and thus she did not "own" it like she did her car.  She attempted to explain why she differentiated between an auto loan on the one hand, and the operating loan secured by the trailer on the other.  Her misconception is plausible given her education and experience.

Finally, Mr. Hugues's surprise about the mistake made in disclosing the fifth-wheel expressed during the 2004 examination leads the Court to believe the omission of the horse trailer was an oversight.  When Trustee asks Mr. Hugues why he had valued the horse trailer at only $150, Mr. Hugues states "that's not right," and proceeds to identify, although not in the clearest fashion, that there are actually three, not two, trailers.  He explains to counsel for Trustee that the utility trailer is not the same as the horse trailer.  The Court observed Mr. Hugues's

MEMORANDUM OF DECISION - 15

demeanor during trial, and he appeared forthright and honest, even if at times somewhat confused by all the technical niceties involved in the bankruptcy process. The Court believes Mr. Hugues' testimony as well that, in filing the inaccurate schedules, he had no intent to cause people to believe that the reference to a utility trailer worth $150 was meant to deflect attention from the horse trailer. Indeed, the Court is persuaded that Mr. Hugues was likely unaware of the problem in his bankruptcy schedules until the 2004 examination.

Trustee relies upon Defendants' low valuation of the fifth-wheel as evidence of their attempts to mislead him. That Defendants, even when they amended their schedules to include the trailer, believed their estimate of its value as $5,800 is not significant, even though Trustee was able to sell the unit for much more at auction. Mr. Hugues, who was aware of the defects with the trailer, testified he would never have purchased the trailer for the $12,000 sales price obtained by Trustee. Consistent with his testimony during the 2004 examination, he stated that it was worth $5,800. Indeed, Defendants never actually used the fifth-wheel because of the repair work it required.

## Conclusion

When all relevant facts and circumstances are considered, including the Defendants' level of sophistication and their demeanor, the Court concludes

Trustee has not shown Defendants acted with the requisite fraudulent intent in failing to disclose the horse trailer in their schedules. Defendants appear to the Court to be honest and deserve a discharge in bankruptcy.

A separate judgment will be entered in favor of Defendants.

Dated: August 29, 2006

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 17